IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-00261

JENNIFER C. HOCKMAN,

      Plaintiff,

v.

I-FLOW, LLC f/k/a I-FLOW CORPORATION,

      Defendant.

---

## PLAINTIFF'S COMPLAINT

---

      Plaintiff, Jennifer C. Hockman, by and through her attorney, Daniel Lee English of the Law Firm of Daniel Lee English, P.C., for her Complaint against the Defendant I-Flow, LLC f/k/a I-Flow Corporation, upon information and belief, states and alleges as follows:

      1.    Plaintiff, Jennifer C. Hockman ("Plaintiff"), resides at 180 S. Avion Dr. #201, Crested Butte, CO  81224.

      2.    Defendant I-Flow, LLC f/k/a I-Flow Corporation ("I-Flow") is a Delaware corporation with its principal place of business at 20202 Windrow Drive, Lake Forest, California, and in 2004 and presently was/is doing business in the State of Colorado.

      3.    At all times relevant hereto, I-Flow, including its subsidiaries, affiliates, predecessors and/or successors (collectively "I-Flow") was in the business of researching, developing, designing, promoting, manufacturing, marketing, and distributing an intra-articular pain pump under the trademark name of On-Q PainBuster Post-Op Pain Relief System ("pain pump").

4.      Plaintiff refers to Defendant I-Flow as the "Defendant."

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Plaintiff is a citizen of the State of Colorado, and Defendant is a citizen of a state other than the State of Colorado.

6.      At all relevant times hereto, Defendant does substantial business in the State of Colorado, including the marketing and sale of medical products, including the pain pump described above, and has engaged in unlawful conduct in the State of Colorado.

7.      Venue is proper in this district pursuant to 28 U.S.C. §1391.  Plaintiff resides in the State of Colorado and the pain pump identified above was surgically implanted in Plaintiff in this District.

### GENERAL ALLEGATIONS

8.      On or about December 20, 2004, Plaintiff, who is left hand dominant, underwent arthroscopic surgery on her left shoulder necessitated by left shoulder instability and a SLAP lesion.  Dr. Stephen W. Houseworth was Plaintiff's orthopedic surgeon.

9.      Other than the conditions described above, at the time of this surgery, Plaintiff had a healthy and normal shoulder joint with no cartilage deterioration, arthritis or congenital shoulder pathology.

10.      During Plaintiff's December 20, 2004 surgery, Defendant's pain pump catheter infusing bupivacaine was inserted into Plaintiff's glenohumeral joint (shoulder joint) in an effort to provide her with continuous pain relief post-surgery. Through the pain pump catheter, the pain

medication is administered directly into the shoulder joint. When used in this manner and with this medication, the pain pump is defective and unreasonably dangerous.

11.    After the surgery, Plaintiff began experiencing increased left shoulder pain, stiffness, weakness, crepitus and reduced range of motion.

12.    Accordingly, on or about March 14, 2005, Plaintiff underwent an arthroscopic debridement surgery on her left shoulder.  At the time of her second surgery, Plaintiff was diagnosed as suffering from Grade III-IV chondromalacia of the glenoid labrum and humeral head; this diagnosis was confirmed radiographically.

13.    Upon information and belief, the pain pump used in Plaintiff's December 20, 2004 surgery was manufactured by Defendant.

14.    Neither of Plaintiff's two left shoulder surgeries were successful; consequently, Plaintiff continued to experience increased left shoulder pain, stiffness, popping, shoulder weakness, crepitus, and reduced range of motion subsequent to both her first and second surgeries.

15.    The continuous injection of bupivacaine (with or without epinephrine) directly into the shoulder joint via the pain pump used in her December 20, 2004 surgery caused serious and permanent damage to the cartilage of Plaintiff's glenohumeral joint. As a direct consequence of the intra-articular infusion of bupivacaine via the aforementioned pain pump, Plaintiff developed postarthroscopic glenohumeral chondrolysis ("PAGCL") of her left shoulder joint.

16.    PAGCL is a devastating complication of shoulder arthroscopy wherein the glenohumeral cartilage begins to deteriorate months later after surgery, but most often not diagnosed until years later, causing permanent/lifetime pain, stiffness, and the inability to use the affected shoulder. Without glenohumeral cartilage, the shoulder and its anatomical parts cannot

move smoothly and properly and when severe cartilage loss has occurred, shoulder replacement surgery is necessary.

17.    After undergoing the above mentioned unsuccessful surgeries, and in order to obtain relief from the PAGCL, Plaintiff will ultimately require an arthroplasty procedure wherein a "prosthetic glenohumeral joint" will be implanted.  In addition to the permanent impairment associated with a prosthetic left shoulder joint, Plaintiff will most likely require additional prosthetic shoulder surgeries in the future including a "reverse" arthroplasty procedure.

18.    Prior to December 20, 2004 and since that date, alternative arthroscopic procedures and pain control techniques were available that were fully accepted among the orthopedic community and proven to be safe and effective by clinical experience as reported in appropriate orthopedic literature.

19.    The Defendant failed to conduct sufficient and necessary studies regarding the safety, use, and efficacy of the pain pump for intra-articular use in the shoulder joint. Despite this fact, the Defendant represented the contrary to the medical community and the public in general.

20.    Based on the studies the Defendant did conduct, they knew, or should have known, that the pain pump, when used in the manner involved in Plaintiff's surgery, posed serious and potentially dangerous hazards to persons such as Plaintiff.

21.    The Defendant had aggressively promoted the pain pump with extraordinary commercial success for a number of uses, including arthroscopic shoulder surgery.

22.    The Defendant marketed the pain pump for the purpose of making a profit.

23.    At all times relevant hereto, the Defendant was aware or should have been aware that the pain pump posed an unreasonable risk of PAGCL to a significant number of patients.

24.    At all relevant times, the Defendant knew or reasonably should have known, that the pain pump was unreasonably dangerous and defective when used as directed and as designed. Proper research, together with a reasonably careful search and review of the scientific and medical literature, and other information, should have indicated to the Defendant that:

    a.    Commonly used anesthetics, such as bupivacaine, with or without epinephrine, when used in the pain pump were harmful to human and animal articular cartilage;

    b.    Use of the pain pump in a joint space had not been approved by the F.D.A. and, in fact, such an indication had been specifically rejected by the F.D.A.;

    c.    Continuous injection of such medications through a catheter directly into the shoulder joint had not been adequately tested for safety or effectiveness;

    d.    The risk of chondrolysis and other serious post-operative problems associated with using the pain pump infusing anesthetic drugs such as bupivacaine in the glenohumeral joint space outweighed the possible benefits of such use.

25.    After knowing that the pain pump caused PAGCL and posed serious and potentially dangerous injury and illness to persons who utilized it, the Defendant, through its agents, servants, and employees, continued to promote the use of the pain pump to physicians who would be prescribing the unit to members of the public, including the Plaintiff.  The Defendant failed to timely and adequately inform the consuming public, including the Plaintiff, FDA authorities, and/or prescribing physicians, of the inherent dangers and risks associated with the use of the pain pump.

26.     The Defendant actively concealed the dangers of the pain pump from the Plaintiff, FDA authorities, and the worldwide consuming public and medical professionals.

27.     The Plaintiff did not know and was not made aware of the full extent of the risks and dangers associated with the pain pump and bupivacaine until 2015 when she was so advised by an orthopedic surgeon. The Defendant intended to deceive the consuming public, medical professionals, FDA authorities, and the Plaintiff into believing that the pain pump infusing anesthetic drugs such as bupivacaine was safe when they knew, or should have reasonably known, the true nature and extent of the severe results from its use. The Defendant failed to provide adequate warnings to the Plaintiff and/or her prescribing physicians and other medical professionals regarding the associated risks in utilizing the pain pump infusing anesthetic drugs such as bupivacaine.  In fact, the Defendant warranted and represented that the pain pump infusing anesthetic drugs such as bupivacaine was safe.

28.     The harmful effect of the pain pump's infusion of bupivacaine injured the Plaintiff. This harmful effect was known or should have been known to the Defendant at all times relevant hereto, but was not adequately communicated to the Plaintiff. The Defendant represented to the Plaintiff, the consuming public, FDA authorities and the medical profession that the pain pump infusing anesthetic drugs such as bupivacaine was safe and posed no significant health hazard to consumers. In reality, the subject use of the pain pump infusing anesthetic drugs such as bupivacaine causes severe injury, including PAGCL.

29.     The Defendant therefore wrongfully put the Plaintiff at risk of harm without full, proper and adequate and/or timely disclosure, and/or warning of the potential risks, hazards, and/or benefits in a truthful way.

30. Obviously, had the Plaintiff known the full extent of the risks and dangers associated with the pain pump infusing anesthetic drugs such as bupivacaine, the Plaintiff would not have permitted their utilization in connection with her December 20, 2004 surgery.

31. At no time prior or after Plaintiff's uses of the pain pump did the Defendant warn that PAGCL may result from its continued use.

32. At all times relevant hereto, the Defendant acted in a willful, wanton and reckless disregard of public safety and the general health and well-being of the Plaintiff.

33. The injuries, damages and losses suffered by the Plaintiff, as described herein, were the reasonably foreseeable result of the Defendant's individual negligence and/or the result of the Defendant's design, manufacture, marketing, and distribution of the unreasonably dangerous pain pump infusing anesthetic drugs such as bupivacaine.

34. The Defendant did not warn the Plaintiff or her surgeon about the unreasonable risks and dangers of using a pain pump infusing bupivacaine intra-articularly in her left glenohumeral joint.

**FIRST CLAIM FOR RELIEF**
**NEGLIGENCE AND RECKLESSNESS**

35. The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

36. The Defendant was negligent and/or reckless in the licensing, testing, design, manufacture, packaging, warning, advertising, promotion, distribution, and sale of the pain pump.

37. The Defendant owed a duty of reasonable care to the Plaintiff to license, test, design, manufacture, package, properly and adequately warn, promote, distribute, perform quality assurance evaluations, and/or sell the pain pump in a safe condition.

38.     The Defendant breached its duty in that it failed to exercise reasonable care and/or was reckless in the licensing, testing, quality assurance, design, manufacture, packaging, warning, advertising, promotion, distribution, and sale of the pain pumps.

39.     The negligence of the Defendant included, but is not necessarily limited to:

a.      Failing to warn the consuming public and the medical profession that the pain pump was unsafe, defective and posed a significant health hazard to consumers when used in the shoulder joint space.

b.      Failing to disclose to the U.S. medical community that continuous injection of commonly used anesthetics such as bupivacaine, with or without epinephrine, into the shoulder joint space may cause serious and permanent injury to the joint cartilage, including PAGCL;

c.      Failing to include a contraindication against placing the catheter of the pain pump in the shoulder joint space and infusing anesthetic drugs such as bupivacaine;

d.      Failing to provide to the U.S. medical community adequate instructions for the safe use of the pain pump; specifically failing to identify anesthetic medications that could be safely and effectively used in the shoulder joint space and infusing anesthetic drugs such as bupivacaine;

e.      Failing to disclose to the U.S. medical community that the effectiveness of the pain pump infusing bupivacaine and/or other anesthetic drugs was uncertain for use in the shoulder joint space;

f.      Manufacturing a product designed to be injected directly into the shoulder

joint that caused damage to articular cartilage;

g.      Manufacturing a product designed to deliver, over time, dangerously high doses of anesthetic type medication such as bupivacaine directly into the shoulder joint; and

h.      Promoting the pain pump for use in the glenohumeral joint space after the FDA had considered and rejected such an indication.

40.      The conduct of the Defendant was negligent, reckless and beyond all standards of common decency.

41.      By reason of the foregoing, the Plaintiff has and will suffer permanent bodily injury, physical and mental pain, suffering, and economic loss.

42.      The Defendant is liable to the Plaintiff for its negligence and/or recklessness.

43.      As a direct and proximate result of the negligence and/or recklessness of the Defendant, and as a result of the actions and/or inactions of the Defendant as set forth in this Complaint, Plaintiff was caused to suffer damages including, but not limited to:

a.      Left glenohumeral joint PAGCL requiring an arthroplasty procedure and most likely subsequent arthroplasty procedures;

b.      Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

c.      Past and future medical, drug, hospital, and other related expenses;

d.      Past and future physical and mental pain and suffering;

e.      Past and future impairment of life enjoyment/impairment of quality of life;

f.      Past and future mental anguish, emotional distress, and emotional stress;

and

g.      Permanent physical impairment.

### SECOND CLAIM FOR RELIEF
### STRICT PRODUCT LIABILITY

44.     The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

45.     At all times material to these allegations, Defendant designed, tested, manufactured, assembled, labeled, marketed, promoted, distributed and sold the pain pump, including the ON-Q PainBuster mentioned above and at issue in this case.

46.     Defendant placed its pain pump into the stream of commerce.

47.      Plaintiff and her parents purchased and/or ultimately obtained the pain pump from Defendant.

48.     Plaintiff was given a pain pump with anesthetic as prescribed by her physician in a manner that Defendant intended its product to be used.

49.     Defendant's pain pump was defective and unreasonably dangerous when it entered the stream of commerce such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of the product.

50.     Defendant's pain pump was defective in design and/or formulation because, when it left Defendant's hands, the foreseeable risks exceeded the benefits associated with the design and/or formulation.

51.     The dangers posed by the defective condition of the pain pump, particularly that the pain pump's delivery of anesthetic solution into or near the shoulder joint space would cause destruction of the shoulder joint, were not readily recognizable by the ordinary users of the pain

-10-

pump.

52.     The pain pump was expected to and did reach Plaintiff without substantial change in condition. Alternatively, the pain pump manufactured and/or supplied by Defendant was defective in design or formulation, in that when it left Defendant's hands, it was unreasonably dangerous and more dangerous than an ordinary consumer would expect.

53.     The pain pump was defective due to inadequate warning and/or inadequate clinical trials, testing and study, and inadequate reporting regarding the results of such studies.

54.     The pain pump was defective due to inadequate pre-and post-marketing warning or instruction because, after Defendant knew or should have known of the risk of chondrolysis associated with its product, it failed to provide adequate warnings to the medical community and patients, and continued to promote the product as safe and effective.

55.     Plaintiff's orthopedic surgeon, Dr. Houseworth, did not have actual knowledge sufficient to know the danger posed by the use of Defendant's pain pump designed and marketed to continuously infuse the joint space with local anesthetics. Defendant did not give Plaintiff, her parents or her orthopedic surgeon sufficient warning regarding the danger posed by the use of the pain pump designed and marketed to continuously infuse the shoulder joint with local anesthetics.

56.     Plaintiff was the type of patient which Defendant reasonably expected would be prescribed the pain pump for post-operative intra-articular use.

57.     Defendant had the option to remove the pain pump from the market at any time or provide adequate warnings to orthopedic surgeons or consumers at any time, but failed to do so in a timely and responsible manner.

58.     The pain pump manufactured, distributed, tested, sold, marketed, advertised and

represented defectively by Defendant caused, or at least, was a substantial factor in bringing about Plaintiff's injuries that would not have occurred but for the use of the product.

59. As a direct and proximate result of the defective condition of Defendant's pain pump, Plaintiff suffered and will continue to suffer injuries, damages, and losses as follows:

a. Left glenohumeral joint PAGCL requiring an arthroplasty procedure and most likely subsequent arthroplasty procedures;

b. Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

c. Past and future medical, drug, hospital, and other related expenses;

d. Past and future physical and mental pain and suffering;

e. Past and future impairment of life enjoyment/impairment of quality of life;

f. Past and future mental anguish, emotional distress, and emotional stress; and

g. Permanent physical impairment.

**THIRD CLAIM FOR RELIEF
FAILURE TO WARN -- STRICT LIABILITY**

60. The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

61. The Defendant, at all times relevant hereto, was engaged in the marketing, promotion, formulation, manufacture, distribution and sale of the intra-articular infusion pain pump such as the one at issue.

62. The Defendant is strictly liable in tort to the Plaintiff upon the grounds that:

a.      The pain pump was unsafe, defective and unreasonably dangerous for its
intended and foreseeable uses.

b.      The pain pump was formulated, manufactured and distributed in such an
unreasonably dangerous condition that it was likely to cause harm to users
thereof when being used for its intended purpose.

c.      The Defendant distributed, promoted and sold the pain pump without
providing adequate warnings of the dangers that were known or should have
been known; Defendant failed to provide adequate warnings regarding all
known or reasonably knowable potential dangers associated with the use of
the pain pump and the comparative nature, extent, severity, incidence and
duration of such dangers; Defendant failed to provide adequate warnings
regarding the signs, symptoms, incidence, and scope of severity of the
dangers, and/or identify appropriate testing, monitoring and/or remedial
action; Defendant failed to provide adequate warnings in a timely manner
information necessary for their purposes, thus placing the Plaintiff and the
consuming public at risk.

d.      The Defendant failed to perform adequate testing that would have revealed
that the pain pump when used with bupivacaine and/or other anesthetic
drugs posed serious dangers, including PAGCL. Defendant also failed to
monitor the situation as it developed. As a result of this failure, full and
proper warnings were not made that would have accurately and fully
reflected the scope and severity of the dangers associated with the pain

pump.

e.    The Defendant was aware that the pain pump would be used without inspection and study for the defects inherent with its use as alleged, and that given the resources of the consuming public and their medical professionals, any reasonably anticipated inspection would have failed to detect the defects.

f.    The Defendant expected and knew that the pain pump would reach the consumers and the Plaintiff and be used in such a manner consistent with Defendant's indication.

g.    The Plaintiff was a foreseeable user of the product and used the product in its intended manner and suffered serious harm because of said use.

63.    The pain pump manufactured and/or supplied by the Defendant was defective due to inadequate post-marketing warnings and/or instructions because, after the Defendant knew or should have known of the risks of injury from the use of the pain pump, it failed to provide adequate warnings to consumers of the product and continued to aggressively promote the pain pump.

64.    The Defendant knew or should have known of the defective nature of the pain pump, but continued to design, manufacture, promote, market and sell the pain pump so as to maximize sales and profits at the expense of the health and safety of the consuming public and in conscious disregard of foreseeable harm.

65.    The Defendant had a duty to warn of dangers associated with the product which it knew or had reason to know were inherent in the use of the product.

66.     During the times that the Plaintiff utilized the pain pump, the Defendant knew or should have known of the risks related to its use including, but not limited to, those specifically set forth herein.

67.     The Defendant had a duty to warn prescribing physicians and consumers of the known or suspected risks arising from the use of the pain pump.

68.     As a direct and proximate result of the failure to warn of the Defendant, and as a result of said Defendant's actions and/or inactions as set forth in this Complaint, the Plaintiff was caused to suffer damages including, but not limited to:

    a.     Left glenohumeral joint PAGCL requiring an arthroplasty procedure and subsequent arthroplasty procedures;

    b.     Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

    c.     Past and future medical, drug, hospital, and other related expenses;

    d.     Past and future physical and mental pain and suffering;

    e.     Past and future impairment of life enjoyment/impairment of quality of life;

    f.     Past and future mental anguish, emotional distress, and emotional stress; and

    g.     Permanent physical impairment.

## FOURTH CLAIM FOR RELIEF
## DEFECTIVE DESIGN -- STRICT LIABILITY

69.     The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

70.     The pain pump manufactured and/or supplied by the Defendant was placed into the

stream of commerce in a defective and unreasonably dangerous condition in that the foreseeable risks exceeded the benefits associated with the design or formulation.

71.     The pain pump manufactured and/or supplied by the Defendant was placed into the stream of commerce with a defective design or formulation because it was unreasonably dangerous and more dangerous than an ordinary consumer would expect, and more dangerous than other forms of treatment for pain.

72.     As set forth herein and otherwise, the Defendant knew or should have known of the pain pump's defective nature, but continued to design, manufacture, market, promote, represent to the consuming public, the medical profession, and the Plaintiff that the pain pump was safe for the sole purpose of maximizing sales and profits at the expense of the public health and safety in conscious disregard of the foreseeable harm caused by the pain pump.

73.     As a direct and proximate result of the Defendant's pain pump's defective design as set forth in this Complaint, the Plaintiff was caused to suffer damages including, but not limited to:

> a.     Left glenohumeral joint PAGCL requiring an arthroplasty procedure and subsequent arthroplasty procedures;
>
> b.     Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;
>
> c.     Past and future medical, drug, hospital, and other related expenses;
>
> d.     Past and future physical and mental pain and suffering;
>
> e.     Past and future impairment of life enjoyment/impairment of quality of life;
>
> f.     Past and future mental anguish, emotional distress, and emotional stress;

and

g.    Permanent physical impairment.

## FIFTH CLAIM FOR RELIEF
## BREACH OF IMPLIED WARRANTY

74.    The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

75.    At all times material hereto, the Defendant marketed, sold and distributed the pain pump and knew and promoted the use for which the pain pump was being used by the Plaintiff and impliedly warranted to the Plaintiff that the pain pump was of merchantable quality and safe for its intended use.

76.    Plaintiff reasonably relied on the skill, expertise and judgment of the Defendant and its representations as to the fact that the pain pump was safe for its intended use and of merchantable quality.

77.    The pain pump manufactured and supplied by the Defendant was neither safe for the intended use, nor of merchantable quality, as impliedly warranted by the Defendant, in that the pain pump had dangerous side effects as outlined in this Complaint.

78.    As a direct and proximate result of the Defendant's breach of implied warranty, the Plaintiff was caused to suffer damages including but not limited to:

a.    Left glenohumeral joint PAGCL requiring an arthroplasty procedure and subsequent arthroplasty procedures;

b.    Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

c.    Past and future medical, drug, hospital, and other related expenses;

d.     Past and future physical and mental pain and suffering;

e.     Past and future impairment of life enjoyment/impairment of quality of life;

f.     Past and future mental anguish, emotional distress, and emotional stress; and

g.     Permanent physical impairment.

**SIXTH CLAIM FOR RELIEF**
**BREACH OF EXPRESS WARRANTY**

79.     The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

80.     The Defendant expressly warranted that the pain pump was safe for its intended use.  However, as otherwise described in this Complaint, the pain pump did not conform to these express representations including, but not limited to, representations that it was well-accepted in patient studies, representations that it was safe, and representations that it did not have high and/or unacceptable levels of risk of danger as otherwise set forth in this Complaint and/or in the Defendant's sales, promotional and education materials and/or publications.

81.     Plaintiff reasonably relied on the skill, expertise and judgment of the Defendant and its representations as to the fact that the pain pump was safe for its intended use and of merchantable quality.

82.     The pain pump manufactured and supplied by the Defendant was neither safe for the intended use, nor of merchantable quality, as expressly warranted by the Defendant, in that the pain pump had dangerous side effects as outlined in this Complaint.

83.     As a direct and proximate result of the Defendant's breach of express warranty, the Plaintiff was caused to suffer damages including, but not limited to:

a.   Left glenohumeral joint PAGCL requiring an arthroplasty procedure and subsequent arthroplasty procedures;

b.   Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

c.   Past and future medical, drug, hospital, and other related expenses;

d.   Past and future physical and mental pain and suffering;

e.   Past and future impairment of life enjoyment/impairment of quality of life;

f.   Past and future mental anguish, emotional distress, and emotional stress; and

g.   Permanent physical impairment.

## SEVENTH CLAIM FOR RELIEF
## NEGLIGENCE PER SE

84.   The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

85.   The Defendant had an obligation not to violate the law.

86.   The Defendant violated the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 301 et. seq., related amendments and codes, and federal regulations promulgated thereunder, and other applicable state and federal laws.

87.   The Plaintiff, as a purchaser and consumer of the Defendant's pain pump, is within the class of persons the statutes described above are designed to protect.

88.   Injury due to false, misleading, and/or reckless advertising and promotion, and misbranding, misleading product, and as otherwise set forth in this Complaint, is the specific type of harm these statutes are designed to prevent.

89.     The Defendant is responsible to the Plaintiff for injuries incurred for the violations of the statutes described above under the doctrine of negligence per se.

90.     As a direct and proximate result of the negligence and negligence per se of the Defendant, and as a result of the Defendant's actions and/or inactions as set forth in this Complaint, the Plaintiff was caused to suffer damages including, but not limited to:

   a.     Left glenohumeral joint PAGCL requiring an arthroplasty procedure and subsequent arthroplasty procedures;

   b.     Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

   c.     Past and future medical, drug, hospital, and other related expenses;

   d.     Past and future physical and mental pain and suffering;

   e.     Past and future impairment of life enjoyment/impairment of quality of life;

   f.     Past and future mental anguish, emotional distress, and emotional stress; and

   g.     Permanent physical impairment.

### EIGHTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION

91.     The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

92.     Defendant and its sales representatives, in the course of selling its pain pump for commercial gain, had a duty to use reasonable care in conveying information about its pain pump to Plaintiff, her parents, her surgeon and other medical providers using its pain pump.

93.     Defendant and its sales representatives, in the course of their business, breached

their duty by negligently misrepresenting and failing to disclose material facts concerning the risks that the pain pump and anesthetics posed to patients, particularly those using the product for pain relief following shoulder surgery.

94.     Defendant and its sales representatives, in the course of their business, made material misrepresentations and concealments to Dr. Houseworth when they marketed the pain pump to him by failing to provide any warning that the pain pump was neither cleared nor approved for orthopedic or intra-articular use, or provide any other warning to him regarding the risks to cartilage as a result of placing a pain pump catheter infusing bupivacaine into Plaintiff's shoulder joint following shoulder surgeries.

95.     Defendant and its sales representatives knew or should have known, under the circumstances, that those misrepresentations were false.

96.     The false information supplied by Defendant for the use of Plaintiff's surgeon and other medical providers using its product was that Defendant's pain pump was safe, effective, and would not harm or adversely affect Plaintiff's health when used in orthopedic surgery and/or in or near the right shoulder joint.

97.     The misrepresentations and false information communicated by Defendant for the use of Plaintiff, her parents, her surgeons and other medical providers using Defendant's pain pump were material and Plaintiff's surgeon and other medical providers using Defendant's product reasonably relied in good faith on Defendant's misrepresentations and false information, all to the detriment of Plaintiff.

98.     The misrepresentations and concealments by Defendant were made with the intent to advertise, market, and sell its pain pump and anesthetics off-label.

99.     Defendant's sales representatives were often in the surgical suite, instructed doctors and nurses on the filling of the ON-Q PainBuster, visualized the surgeons as they placed the pain pump catheter into the shoulder joint, and interacted directly with patients when they asked patients to sign Patient Acknowledgment and Assignment of Benefits forms. Defendant, through its sales representatives, made material misrepresentations and concealments to patients like Plaintiff when they advertised, marketed and sold their pain pump and anesthetics to them.

100.    The direct relationship between Defendant and patients, such as Plaintiff, is further evidenced by the fact that Defendant reached out directly to patients by sending thank you letters directly to them following their surgeries. These letters were signed ON-Q Billing Coordinator and included ON-Q Billing Frequently Asked Questions and directed patients to contact Defendant directly.

101.    Defendant also stocked physician's offices with brochures including telephone numbers for patients to contact Defendant directly.

102.    Defendant failed to exercise reasonable care of competence in obtaining or communicating truthful and accurate information to Plaintiff, her parents and her physicians, and failed to comply with the existing standard of care.

103.    Defendant is directly liable for the negligent conduct of its actual and/or ostensible employees, servants, and agents, who include, but are not limited to, its sales representatives. The negligent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally, caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Plaintiff.

104.    Plaintiff, her parents and her physicians justifiably relied on the misrepresentations

-22-

and concealments, and as a direct and proximate result of such reliance, Plaintiff suffered and will continue to suffer injuries, damages, and losses as follows:

a.   Left glenohumeral joint PAGCL requiring an arthroplasty procedure and subsequent arthroplasty procedures;

b.   Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

c.   Past and future medical, drug, hospital, and other related expenses;

d.   Past and future physical and mental pain and suffering;

e.   Past and future impairment of life enjoyment/impairment of quality of life;

f.   Past and future mental anguish, emotional distress, and emotional stress; and

g.   Permanent physical impairment.

**NINTH CLAIM FOR RELIEF**
**FRAUD AND DECEIT**

105.   The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

106.   Defendant blatantly and intentionally distributed false information, including but not limited to assuring the public, Plaintiff, her parents, her physicians, hospitals, and healthcare professionals that the pain pump infusing bupivacaine was safe for its intended use in the shoulder joints.

107.   Defendant and its agents and sales representatives knowingly, intentionally, directly and/or impliedly made material misrepresentations to Plaintiff, her parents, her physicians, and to the public that the pain pump and the anesthetics used in the pump were safe for use

following shoulder surgeries, such as Plaintiff's.

108.    Defendant and its agents and representatives knowingly, intentionally, directly and/or impliedly misrepresented to Dr. Houseworth that the pain pump was safe and effective for the management of post-operative intra-articular pain when placed in the joint space.

109.    Defendant and its agents and representatives knowingly, intentionally, directly and/or impliedly misrepresented to Dr. Houseworth that its pain pump was FDA cleared for use in the joint space.

110.    The representations by Defendant's agents and sales representatives were in fact false, as the pain pump and the anesthetics used in the pump were not safe for human use following shoulder surgeries, and instead proximately caused narrowing of the joint space, glenohumeral chondrolysis and other injuries and/or adverse side effects.

111.    When Defendant's agents and sales representatives made these representations that their pain pump and the anesthetics used in the pumps were safe for use following shoulder surgeries such as Plaintiff's, they knew those representations were false, deceptive, and misleading, and they made those false representations with the intent to defraud, deceive, and mislead. For example, on July 21, 1999, Robert Bard, the vice president of regulatory affairs for Defendant, admitted to Kevin Sumstine of DJO, who had contracted with Defendant to sell the PainBuster to orthopedic surgeons, that despite three attempts to secure synovial cavity use in its 510(k), the FDA had rejected this use each and every time. Thus, Defendant marketed the pain pump for orthopedic use in the joint space knowing it was not approved for those purposes with the intent to defraud, deceive, and mislead physicians, including Plaintiff's.

112.    In December of 2004, Plaintiff, her parents, her physicians, and the public

justifiably relied upon the misrepresentations of Defendant's agents and representatives and reasonably believed the misrepresentations to be true, and in justifiable reliance upon these misrepresentations, were induced to prescribe and use the pain pump and the continuously infused anesthetics.

113.    Had Defendant not misrepresented its pain pump's uses, safety and regulatory status to Dr. Houseworth, he would not have used the pain pump following Plaintiff's surgery.

114.    By misrepresenting the regulatory status of the pain pump (e.g., that it was approved for use in the shoulder joint), its safety (e.g., that it was safe for use), and the uses for which it could be put (e.g., in orthopedic procedures and in the joint space), Defendant failed to exercise reasonable care in disseminating this information when first promoting the product to Dr. Houseworth and continuing through her use of it in Plaintiff's surgery.

115.    At no time did Defendant correct the misinformation provided to Dr. Houseworth when he began using the pain pump or otherwise disclose to him the regulatory status/history, risks, and proper/improper uses as described herein.

116.    At the time of Plaintiff's surgery, Defendant was aware that orthopedic surgeons were using pain pumps intra-articularly and those sales representatives and distributors had promoted the product for those uses.

117.    Had Defendant not made express and implied false statements about the product, Dr. Houseworth would have made a different decision about whether or how to use the pain pump and Plaintiff's injury would have been avoided.

118.    Defendant authored and approved literature, materials, and trainings about its pain pump reasonably expecting that others would rely on it.

119.    As illustrated above, Defendant engaged in a pattern and practice of promoting the pain pump for orthopedic and intra-articular use.

120.    Alan Dine confirmed in his deposition on December 16, 2008 that an efficacious and safe dosage for intra-articular administration of bupivacaine via its pain pump had never been determined in any clinical study designed by Defendant for this purpose. Yet, Defendant continued to market its pain pumps for that use.

121.    As illustrated above, Defendant had actual notice that patients were suffering devastating injuries to their joints when Defendant's pain pump was used in orthopedic surgeries.

122.    Undaunted, Defendant continued to provide physicians with information about placing the pain pump catheter into the joint space.

123.    Defendant is directly liable for the negligent and/or fraudulent conduct of its actual and/or ostensible employees, servants, and agents, who include, but are not limited to, its sales representatives. The negligent and/or fraudulent conduct of these employees, servants, and actual and/or ostensible agents, jointly and severally, caused and/or increased the risk of harm of, and the grievous injuries and damages sustained by Plaintiff.

124.    Plaintiff does not allege fraud on the FDA as no false statements made to FDA are part of Plaintiff's claims.

125.    Plaintiff's allegations of fraud and misrepresentation are based on representations and omissions to Plaintiff, her parents, her physician and the public regarding the pain pump's uses, safety, and FDA clearance, not communications with the FDA in order to obtain approval for certain uses.

126.    As alleged herein, Defendant did not merely allow Dr. Houseworth to purchase or

-26-

use the pain pump for uses other than those for which FDA had cleared the product; rather, Defendant misrepresented, omitted, and misled Dr. Houseworth about the approved and safe uses of the product. Thus, at the time of Dr. Houseworth's first surgery, Defendant caused Dr. Houseworth to use the product in ways other than those for which FDA had cleared the device rather than allow him to make an informed decision about off-label use.

127.    As a result of the fraud and deceit of Defendant and Defendant's agents and sales representatives, Plaintiff suffered and will continue to suffer injuries, damages, and losses as follows:

    a.    Left glenohumeral joint PAGCL requiring an arthroplasty procedure and subsequent arthroplasty procedures;

    b.    Past, present, and future loss of time and wages and a permanent impairment of her earning capacity;

    c.    Past and future medical, drug, hospital, and other related expenses;

    d.    Past and future physical and mental pain and suffering;

    e.    Past and future impairment of life enjoyment/impairment of quality of life;

    f.    Past and future mental anguish, emotional distress, and emotional stress; and

    g.    Permanent physical impairment.

### TENTH CLAIM FOR RELIEF
### STATUTE OF LIMITATIONS AND
### FRAUDULENT CONCEALMENT

128.    The Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

129.    The applicable statute of limitations enacted in Colorado sets forth a two-year limit for filing an action after a cause of action accrues.  However, C.R.S. 13-80-108(1) states that such statute of limitations "...accrues on the date that both the injury and their cause are known or should have been known by the exercise of reasonable diligence."

130.    Plaintiff did not become aware that she suffered from PAGCL (i.e. chondrolysis) nor did she learn that the cause of her PAGCL (chondrolysis) was the infusion of bupivacaine via the pain pump catheter implanted post-operatively following her December 20, 2004 surgery until after she was examined on April 21, 2015 by Dr. Peter Millett, a physician at the Steadman Clinic located in Vail, Colorado.

131.    Not only did Plaintiff not have actual knowledge of the facts essential to a cause of action but neither should she have had such knowledge in the exercise of reasonable diligence. The basis of this proposition is that Plaintiff had been examined and treated by various physicians from the date of her second surgery, March 14, 2005, through the date of her examination with Dr. Millett, which was on April 21, 2015, as aforesaid, and all her treating physicians diagnosed her left shoulder pathology as degenerative joint disease (DJD) or arthritis, or osteoarthritis; no information had ever been communicated to Plaintiff prior to April 21, 2015 that she presented with PAGCL (chondrolysis) or that the cause of her glenohumeral cartilage deterioration was the anesthetic drug infused in her glenohumeral joint post-operatively to her December 20, 2004 surgery.

132.    Plaintiff and her parents, as well as her physicians, were deprived of vital information essential to the pursuit of these claims without any fault or negligence on their part. Plaintiff and her parents could not reasonably have known, discovered or become aware of the

dangerous nature of and the unreasonable adverse side effects associated with, nor establish any provable compensable damages caused by, the intra-articular use of the Defendant's pain pump infusing bupivacaine post-operatively to her December 20, 2004 surgery.

133.    Neither Plaintiff nor her parents could have made an earlier discovery prior to April 21, 2015 despite reasonable diligence because of the knowing and active concealment and denial of the facts by the Defendant, as alleged herein.

134.    Defendant is and was under a continuing duty to disclose the true character, quality and nature of its pain pump.  Because Defendant's concealment of the true character, quality and nature of its pain pump, Defendant is estopped from relying on any statute of limitations defense.

135.    For the reasons stated above, Colorado's statute of limitations accrued April 21, 2015 and does not expire until April 20, 2017.

WHEREFORE, the Plaintiff, Jennifer C. Hockman, prays that this Honorable court enter judgment in her favor and against the Defendant I-Flow, LLC f/k/a I-Flow Corporation, and that Plaintiff be awarded the damages described above, in a sum adequate to compensate her for her injuries, damages, and losses, together with interest from the date of her injuries, expert witness fees, Court costs, and for such other and further relief as this Honorable Court deems just and proper.

DATED January 27, 2017.

LAW FIRM OF DANIEL LEE ENGLISH, P.C.
*Original Signature on File*

*s/Daniel Lee English*
     Daniel Lee English
6355 Ward Road, Suite 500
Denver, CO  80004
Telephone: (303)424-3500
Facsimile: 303-424-3598
Email:   daniel@denglishlaw.com
Attorney for Plaintiff Jennifer C. Hockman

Plaintiff's Address:
180 S. Avion Dr. #201
Crested Butte, CO  81224